**2016 UT App 192**

# THE UTAH COURT OF APPEALS

Z-CORP AND ONEGREATFAMILY LLC,
Appellants,
*v.*
ANCESTRY.COM INC. AND ANCESTRY.COM OPERATIONS INC.,
Appellees.

Opinion
No. 20150405-CA
Filed September 9, 2016

Fourth District Court, Provo Department
The Honorable Fred D. Howard
No. 140401466

Robert L. Jeffs, Randall L. Jeffs, and Liisa A.
Hancock, Attorneys for Appellants

Mark O. Morris and Amber M. Mettler, Attorneys
for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGE
KATE A. TOOMEY and SENIOR JUDGE JUDITH M. BILLINGS
concurred.[1]

ORME, Judge:

¶1      Z-Corp and its wholly owned subsidiary OneGreatFamily
LLC (collectively, OGF) appeal from the district court's decision
dismissing OGF's complaint against Ancestry.com Inc. and its
affiliate (collectively, Ancestry) for failure to state a claim. We
affirm the dismissal as to the majority of the claims but reverse

---

1. Senior Judge Judith M. Billings sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

as to OGF's claim that Ancestry wrongfully withheld a portion of the fees owed to OGF.[2]

BACKGROUND

¶2     In April 2009, OGF entered into a marketing agreement with Archives.com. Each agreed to advertise membership subscriptions for the other on their respective websites. In return, the marketing party was to receive sixty percent of the profit from any subscriptions sold through the advertisements. The agreement also expressly directed that both parties were to undertake this marketing "at their sole cost and expense, and

---

2. In its brief, OGF states that it "does not appeal the trial court's dismissal of its conversion claim or its tortious interference with prospective economic relations claim." We therefore have no occasion to address the validity of the district court's dismissal of those claims. Furthermore, OGF makes a claim for punitive damages based on a provision of the contract allowing punitive damages in the event of "breach . . . as a result of gross negligence or willful misconduct." Because OGF does not actually allege that Ancestry's claimed breach resulted from "gross negligence or willful misconduct," and because punitive damages are not ordinarily available in a contract action in any event, *see TruGreen Cos. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 19, 199 P.3d 929, we affirm the dismissal of that claim. Finally, OGF claims that Ancestry breached the covenant of good faith and fair dealing. We readily affirm the dismissal of that claim, too, as explained in this opinion, that Ancestry was within its rights under the contract to do as much or as little marketing for OGF as it pleased. *See generally Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 10, 266 P.3d 814 (noting that the covenant of good faith and fair dealing may not be invoked to "create obligations inconsistent with express contractual terms") (citation and internal quotation marks omitted).

under their own exclusive control." And the contract contained a provision allowing for an accounting at the request of either party.

¶3     Ancestry later purchased Archives and assumed its contractual obligations. Ancestry continued to operate a separate Archives website. At some point following the purchase, OGF noticed a sharp decrease in income from membership subscriptions. After investigation, OGF concluded that Ancestry had removed OGF advertisements from the Archives website. OGF sought an accounting from Ancestry and, dissatisfied with Ancestry's progress in complying with its audit request, OGF sued Ancestry, alleging that Ancestry had materially breached the contract. Ancestry filed a motion to dismiss for failure to state a claim. The district court granted the motion and dismissed OGF's complaint. OGF appeals.

## STANDARD OF REVIEW

¶4     Because this appeal stems from the district court's dismissal of OGF's complaint for failure to state a claim, we apply a single standard of review to the claims still at issue. *See supra* note 2. "[W]e accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff," and "we give the trial court's ruling no deference and review it under a correctness standard." *Alvarez v. Galetka*, 933 P.2d 987, 989 (Utah 1997) (citation and internal quotation marks omitted).

## ANALYSIS

### I. OGF Did Not State a Claim for Breach of Contract Based on Ancestry's Refusal To Continue Marketing on OGF's Behalf.

¶5     Any contract interpretation properly begins with a consideration of the "plain language" or "plain meaning" of the

contract. *South Ridge Homeowners' Ass'n v. Brown*, 2010 UT App 23, ¶ 1, 226 P.3d 758 (citations and internal quotation marks omitted). The plain language of the contract at issue is unique in several ways. For example, each party to the contract, in its role as a marketing resource for the other, was to conduct marketing activity for the other "at [its] sole cost and expense, and under [its] own exclusive control." Thus, neither party had the right to require that the marketing efforts undertaken on its behalf take any particular form, so long as the marketing was, as specified in the parties' agreement, contained "within the paid area of the [marketing party's] website or [distributed] via email to previous paying customers." The rationale underlying the arrangement was not one of mandated obligations but rather an attractive financial incentive; the marketing partner was to retain sixty percent of the membership subscription fees collected while the party for whom it was marketing would receive only forty percent of the fees paid for membership subscriptions. Either party, then, stood to make more money marketing for the *other* party than it did from having the other party market for it.[3]

---

3. This arrangement is very much like a unilateral contract and operates in a similar manner, *see Citynet, LLC v. Toney*, 772 S.E.2d 36, 41 (W. Va. 2015) ("The concept of unilateral contract[ is] where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise[.]") (citation and internal quotation marks omitted), albeit with a uniquely mutual aspect, i.e., each party could earn the payment promised by the other by rendering the specified service for the other. The basic principles of unilateral contracts are helpful in sorting out the present dispute. Particularly, "[a] unilateral contract is a contract in which performance is based on the wish, will, or pleasure of one of the parties. . . . The essence of a unilateral contract is that one party's promise is conditional upon the other party's performance[.]" 17A Am. Jur. 2d *Contracts* § 7 (2016). Furthermore, in a unilateral contract, the parties do

(continued…)

¶6     As the agreement was written, Ancestry was obligated to pay OGF a portion of the subscription fees that it collected for OGF through advertising undertaken on OGF's behalf. The contract does not obligate Ancestry to engage in any particular amount or sort of advertising; rather, it allows Ancestry to advertise for OGF in hopes of collecting membership subscription fees for OGF "at [its] sole cost and expense." If successful, Ancestry would retain sixty percent of the subscription revenue it received on behalf of OGF. But whether to advertise at all was within Ancestry's "own exclusive control." Accordingly, Ancestry's decision to reduce (or even end) its advertising for OGF was not a breach of the contract. It just meant that Ancestry would not be marketing OGF membership subscriptions and would thereby miss out on its substantial cut of the resulting subscription fees. So despite OGF's ongoing promise to allow Ancestry to retain sixty percent of the membership subscription fees collected on its behalf, because Ancestry never promised to market for OGF, Ancestry was free to cease marketing for OGF anytime it pleased.[4] *See* 17A Am. Jur. 2d *Contracts* § 7 (2016). Therefore, the district court correctly dismissed this claim.

---

(…continued)

not exchange promises; rather one party makes a promise inviting the performance of an act that the other party may choose to accept (or not accept) through its performance (or nonperformance) of the specified act. *Id.*

4. Though our decision rests on our conclusion that OGF's interpretation of the contract is incorrect, it is far from clear that OGF would prevail even under its own interpretation. OGF's theory is that Ancestry is required to advertise for OGF either through ad placement on "the paid area of [Ancestry's] website or via email to previous paying customers." OGF has never alleged, however, that Ancestry ceased to advertise "via email to previous paying customers." On the other hand, Ancestry in its

(continued…)

## II. OGF Did State a Claim for Breach of Contract with Regard to Ancestry's Alleged Nonpayment of Membership Subscription Fees Collected by Ancestry but Not Remitted to OGF.

¶7      Although it might have been more prudent of OGF to pursue its audit of Ancestry to verify whether Ancestry had, in fact, retained subscription fee payments collected on behalf of OGF in excess of the authorized amount,[5] the terms of the contract make clear that such an audit, while authorized, is voluntary and may be called for at any time by either party, subject to minor restrictions. Thus, OGF was not obligated to complete an audit as a precondition to filing its lawsuit, as Ancestry contends.

---

(…continued)

motion to dismiss explicitly stated that it "ha[s] included [OGF] in various emails to paying Archives.com subscribers." Indeed, Ancestry even included in its motion a form email presumably sent to such a customer dated February 5, 2013, which was after the time when OGF claims subscriptions to its website began to decrease. In its response to Ancestry's motion, OGF made no mention of Ancestry's email marketing efforts. On appeal, OGF still does not suggest that Ancestry failed to market OGF through emails to paid Archives subscribers, whereas Ancestry again stated that it "ha[s] included OGF in various emails to paying Archives.com subscribers." In short, it appears that Ancestry may well be correct in characterizing OGF's claim as essentially one of sour grapes: OGF sued because Ancestry ceased to market in the manner to which OGF had become accustomed, even though Ancestry was not required to do so and even though it apparently continued to market on behalf of OGF in another approved way.

5. This is especially so given Ancestry's avowed willingness, expressed during oral argument, to pay OGF should an accounting demonstrate monies are owed.

¶8    OGF's claim that "Ancestry . . . withheld payments for subscriptions that are due to OGF" is sufficient to state a claim for breach of contract. This is so because if the claim is true—as we must assume on appeal, *see Alvarez v. Galetka*, 933 P.2d 987, 989 (Utah 1997)—Ancestry's failure to remit the specified percentage of the membership subscription fees to OGF undeniably violated the contractual arrangement between the parties. We therefore agree with OGF that it "had properly articulated [a] separate and actionable breach of contract claim[] for failure to remit payment," and we reverse the decision of the district court insofar as it dismissed that claim.

## CONCLUSION

¶9    With respect to OGF's breach of contract claim based on Ancestry's refusal to continue marketing for OGF on its website, we affirm the district court's dismissal. With respect to OGF's breach of contract claim premised upon the alleged nonpayment of subscription fees due and owing to OGF, however, we reverse because OGF has stated a claim upon which relief could be granted. We remand to the district court for such proceedings as may now be in order.

———————